# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 15, 2011 at Knoxville

## STATE OF TENNESSEE v. BRIAN KENNETH HENNEBERG

### Appeal from the Circuit Court for Williamson County
### No. I-CR033303    Jeffrey Bivins, Judge

---

### No. M2011-00171-CCA-R3-CD - Filed January 20, 2012

---

The defendant, Brian Kenneth Henneberg, appeals his Williamson County Circuit Court jury conviction of first degree premeditated murder, claiming that the evidence was insufficient to support his conviction, that the trial court erred by permitting a police officer to offer expert testimony, that the trial court erred by denying his request for a curative instruction, and that the cumulative effect of the errors deprived him of his constitutional right to a fair trial. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

James O. Martin, III, Nashville, Tennessee (on appeal); Vanessa Bryan, District Public Defender (on appeal); and Thomas T. Overton, Nashville, Tennessee (at trial), for the appellant, Brian Kenneth Henneberg.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Kim R. Helper, District Attorney General; and Tammy Rettig, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On October 12, 2007, the defendant telephoned the non-emergency line of the Spring Hill Police Department ("SHPD") to report that his wife, Megan Henneberg, had been murdered. The defendant told civilian dispatcher Roger Peters that two men of "Middle Eastern descent" carrying "hand-held guns" had broken into the couple's residence, tied him up in a separate room, and murdered his wife. The defendant told Mr. Peters that the men

went to his church but that he did not know their names.  The defendant did not provide a physical description of the alleged perpetrators other than a generalization regarding their ethnic origin and did not provide any description of a vehicle they might be traveling in.  Given the lack of a detailed description, the victim's welfare taking priority, and the fact that he was not a police officer, Mr. Peters did not give an order for officers to be on the lookout ("BOLO") for the alleged assailants.

SHPD Sergeant David Kloke was one of the first officers to respond to the call of a stabbing at the Henneberg residence.  He and another officer knocked at both the front and back doors, but when they received no answer, they entered the house through the unlocked front door.  Inside, they heard a television on at a very high volume.  Sergeant Kloke announced their presence and asked for all present to come out with their hands in the air.  At that point, Sergeant Kloke heard someone running up the stairs.  The officers went to the stairs and observed the defendant coming down with his hands raised.  Sergeant Kloke recalled that the defendant was wearing blue pajama bottoms, house slippers, and no shirt.  The defendant had "dry blood on his right shoulder . . . a scratch on his left side of his chest, . . . a small cut on the palm of his left hand, . . . one scratch on the left side lower back, and also one scratch on the right side also on the lower back."  Sergeant Kloke said that he handcuffed the defendant immediately because he "didn't know at that time exactly who he was or what had occurred.  There w[ere] many unknown variables at that time."

Sergeant Kloke left the defendant with the other officer and began a protective sweep of the house.  In the master bedroom, he saw a woman lying face down in a pool of blood on the bed.  A kitchen knife was protruding from her back, a small knife lay on her neck, and a bloody two-by-four lay next to the bed.  Sergeant Kloke said that he got as close to the body as he could without disturbing the scene to look for signs of life but discerned none. At that point, he called for detectives.  When he returned downstairs, he had the other officer provide the defendant with *Miranda* warnings and secure him in a patrol car.  Before being placed in the car, the defendant told the officers that the perpetrators "were after Mike's kids, they were going to hurt Mike's kids, . . . they were after Mike's money." Sergeant Kloke transported the defendant to the Williamson County Sheriff's Department, where he was photographed and his clothing was confiscated.

During cross-examination, Sergeant Kloke acknowledged that he did not question the defendant, explaining that the defendant "stated he did not wish to speak to anybody."  Sergeant Kloke said that he did not issue a BOLO for two Middle-Eastern men because he "had no knowledge of that" information until "[l]ater on that evening."

Michael Harms, the victim's father, testified that neither he nor any member of his family had ever been threatened by any person of Middle-Eastern descent and that no

person had attempted to extort money from him either before or after the victim's death.

Paramedic Dana Neely responded to the scene and immediately checked the victim for signs of life. Finding none, she declared the victim clinically dead at the scene. Ms. Neely said that the victim had a knife in her back and a "robe belt" near her neck. The victim's hands were raised as though she had been tugging at the "robe belt." The victim was also wearing earplugs. A bloody two-by-four was next to the bed. Ms. Neely opined that the victim had been dead for 15 to 30 minutes prior to her arrival. Ms. Neely said that the bedroom appeared disheveled and smelled strongly of acetone and that the television was "cranked up real loud."

SHPD Lieutenant Justin Whitwell, who responded to the call after learning that the victim was dead, testified that upon his arrival, he attempted to obtain the defendant's consent to search the residence. When the defendant refused, Lieutenant Whitwell obtained a search warrant and began a systematic, video-taped search of the exterior of the residence. Officers then went inside the residence and began their search by looking for signs of forced entry at all the windows and doors. They found none. As he descended the stairs, Lieutenant Whitwell observed a cat coming out of the master bedroom. He closed the cat in the "spare room" and continued toward the master bedroom, where the television was so loud, "you could hear it from the front door" and "could barely hear anybody else talking." There was no blood evidence in any room except the master bedroom, which "was in disarray," with clothes on the floor and a copious amount of blood on the bed and three of the bedroom walls. The victim was lying face down on the bed with her arms "up at her neck . . . like as if she was trying to pull something as she was lying there in the bed." There was a "robe belt" from "a bath robe wrapped around her neck." The victim had a large kitchen knife in her back and a "small folding knife, which was lying loose on the neck." She was also wearing earplugs. The "top portion" of a two-by-four lying next to the bed "was soaked in . . . blood." Officers matched the knife in the victim's back with a set of knives in a block in the kitchen. They found no guns in the house or near the victim.

Officers searched the adjacent bedroom, and the only evidence that someone had been tied up in that bedroom "was a gray robe belt that was lying around the bottom of a bed frame." Lieutenant Whitwell said that even if the defendant had been tied to that particular bedframe with the robe belt, the defendant could easily had freed himself by "rolling the tie across the robe belt" or by cutting the robe belt with "the corner of the bed frame."

Lieutenant Whitwell said there was no evidence of a theft, noting that officers found wallets containing money and credit cards, a digital camera, a cellular telephone, and other expensive items in the house. Officers searched a detached garage behind the house

and found it to be "exceptionally clean." Lieutenant Whitwell said that "you could tell somebody does woodworking back there" given the tools and amount of wood present.

They took fingerprints from the house, focusing particularly upon the weapons used on the victim. Other items sent for fingerprinting included

> "the cordless telephone from the dining room floor, the butcher's block from the counter, the cellular phone from the counter near the sink, mail from the counter near [the] sink, DVD from [the] counter near [the] sink, knife from [the] sink. . . . Gloves from the master bedroom, the DVD from the DVD player, the piece of two-by-four from the master bedroom . . . . [T]he folding knife from the victim's neck . . . and a prescription bottle . . . and the money clip . . . from the office desk."

At some point, Lieutenant Whitwell learned that the defendant claimed two Middle-Eastern men from his church had broken into the residence. He went to the church and spoke to the pastor, who told Lieutenant Whitwell that he did not know anyone in his congregation that fit the description. The lieutenant made no further investigation through the church but did speak to neighbors.

Lieutenant Whitwell testified that he listened to five hours of recorded telephone calls placed by the defendant from jail. The defendant talked about the victim only one time and "never once asked about the Middle Eastern men, or inquired if anybody is still looking for those people." The recordings were played for the jury.

During cross-examination, Lieutenant Whitwell testified that the SHPD did not ask the Tennessee Bureau of Investigation ("TBI") for assistance because they felt qualified to handle the investigation. Lieutenant Whitwell said that he did not send officers to look for the Middle-Eastern men because there was no physical evidence indicating that two men had actually been in the home. He explained that he could not verify what the defendant had said regarding the alleged perpetrators because "when we asked to speak with [the defendant] in regards to this situation and everything, he said he was not going to speak with us, . . . he wanted his attorney there, so we were unable to get any further information to investigate this crime scene." He added, "He wouldn't give us any information in the back of the car, . . . no clothing description, when he was in the same room with these subjects . . . no direction of travel or vehicle information." Lieutenant Whitwell said that, although the defendant had dried blood on his shoulder and on his pants, he did not have any other "smear marks on his body that would say that he was leaned up against [the victim's] body trying to resuscitate her." He later attempted to speak with the defendant after the preliminary hearing about the

-4-

Middle-Eastern men "to follow up on everything . . . to try to make a thorough investigation."

Lieutenant Whitwell admitted that the master bedroom was in disarray, but he stated that the room appeared "staged" to him because of "the way the items were spread about the room." In addition, he thought it odd that the master bedroom was in disarray while no signs of a struggle existed in any other part of the house, including the spare bedroom where the defendant claimed to have been bound to the bed.

Lieutenant Whitwell said that he called animal control personnel to collect the cat Sergeant Kloke had shut into the spare bedroom and that both he and animal control personnel had examined the cat for blood but found none. He noted that no bloody paw prints appeared anywhere in the house.

Metropolitan Nashville Police Department Officer and crime scene specialist Johnny Lawrence testified that he visited the crime scene on October 26, 2007, at the request of Detective Caleb Utterback. He noted the presence of a large amount of blood in the master bedroom and stated that "[i]t was unusual" that "all of the blood was isolated to the room." He said that in a "stranger homicide," the perpetrator "usually" would not take the time to "clean up their tracks before leaving the scene." Officer Lawrence, testifying as an expert in blood pattern evidence, said that the bed had "two large passive stains," indicating "a saturation of the blood on that object." He said that "[t]he blood on the wall appeared to be impact stains," meaning they came "from an object striking liquid blood." Officer Lawrence testified that the blood stain on the defendant's shoulder, which he examined via photograph, was neither a transfer stain nor a "high velocity impact stain." He also said it did not appear to be aspirated blood. Officer Lawrence said that it was possible that the small, freckle-sized stains were the result of blood having soaked through the shirt the defendant had been wearing but concluded that "it's really unknown how these particular stains could have got here." Noting that the stains were "distorted," he said that the blood did not show "a perfect cast-off" pattern either. Officer Lawrence said that there was no way the blood on the defendant's shoulder could have come from the cat.

TBI Special Agent Caleb Utterback testified that at the time of the victim's murder he was a detective with the SHPD. He recalled that his first task in the investigation of the victim's murder was to conduct outside interviews, which started with the patrol officers who first responded to the scene. He removed the defendant from the patrol car and removed the handcuffs and asked for permission to process the crime scene. The defendant declined to speak to him or to sign the consent form. At that point, Detective Utterback obtained a search warrant and a warrant for the defendant's arrest. He had the defendant brought to the police station, photographed his injuries, fingerprinted him, and collected his clothing. According to Detective Utterback, the defendant had a scratch on his chest, a cut

to the palm of his hand, blood on his right index finger, blood on his right shoulder, and blood on his fleece pants. He described the defendant's demeanor at the police station as "very docile."

After the defendant was booked into the jail, Detective Utterback returned to the scene, where seven of the victim's friends had arrived. Detective Utterback interviewed each of them but did not develop any other suspects or persons of interest based upon the information they provided. He made contact with the victim's family on the following morning and later traveled to Morton, Illinois, where they lived "to develop background on the case, to get a feel for how they lived their lives; to investigate the possibility that there might have been a threat on Mr. Harms' life; . . . to talk to the local PD up there to see what they thought about it; [and to] get some background on the families." Upon his return, Detective Utterback conducted more interviews, including the defendant's current and former employers. He said that he never developed any further suspects based upon information gleaned from those interviews.

Based upon his investigation, Detective Utterback obtained a second warrant to search the Henneberg residence, this time for computers, financial records, and journals. In addition, Detective Utterback subpoenaed the couple's financial records and discovered that they were having "financial difficulties." The victim's checking account had a balance of $ 0.77, and a checking account in the name of Henneberg Holdings, a company started by the defendant, had a balance of zero. The balance of the defendant's personal checking account was also zero. A joint savings account had a balance of $ 0.87, and a joint checking account had a negative balance. A Discover Card was within $ 100 of the credit limit, and the payment was past due. Detective Utterback also learned that the defendant had previously been a student at Middle Tennessee State University but had dropped all but one online course on September 11, 2007. Nevertheless, a copy of the defendant's purported school schedule still hung on the refrigerator at the time of the victim's murder.

Doctor Adele Lewis, the forensic pathologist who performed the autopsy of the victim, testified that when the victim's body first arrived "she was face down, wearing bloody clothing, with a red terrycloth . . . belt off of a bath robe tied around her neck, and with a large kitchen knife still sticking out of her back." She also had "numerous cuts to the back of her head." The victim was wearing orange earplugs. Doctor Lewis said that the victim suffered nine stab wounds to her back, two of which pierced her left lung, one of which injured the diaphragm and liver, and one of which pierced her right lung and severed "a large vein . . . in the upper part of the chest on the right side." Some of the stab wounds were between six and ten inches deep, which would have required "a very significant amount of force." According to Doctor Lewis, the victim would have died from the stab wounds alone.

-6-

Doctor Lewis testified that the presence of the robe-belt around the victim's neck, pinpoint hemorrhages in the victim's face and eyes, and hemorrhages in the muscles of the victim's neck led her to conclude that "a strangulation had taken place." She said that the strangulation injury was significant enough, on its own, to have caused the victim's death.

Doctor Lewis testified that the victim also suffered blunt force trauma injuries to her head, specifically "three large lacerations . . . along with a great deal of hemorrhaging into the deep tissues of the scalp." There was also bruising of the brain and "bleeding over the surfaces of her brain." All of the blunt force injuries were confined to the back of the victim's head. Doctor Lewis said that the amount of force required to inflict such injuries would be roughly equal to "hitting a baseball with a baseball bat." The blunt force injuries were sufficient, on their own, to have caused the victim's death.

The cause of death was "multimodality trauma, which means that [the victim] had several different kinds of the injuries that could have accounted for her death," because Doctor Lewis could not "separate out which one of the three causes of death; all three of these separate things, the strangulation, the beating, and the stabbing, worked together to cause her death." It was her opinion that none "of the injuries would have been survivable . . . even had she received medical care."

Patrick Ihrie, a former TBI forensic scientist in the deoxyribonucleic acid ("DNA") and serology unit, testified that the blood on the pants the defendant was wearing matched the victim. A green shirt found in the master bedroom had the defendant's skin cells on the collar and the victim's blood on the shoulder. Blood and skin cells on a pair of gloves found in the master bedroom matched the victim. Blood on the tip of the two-by-four matched the victim while blood on the "handle" end was a mixture of the victim's and the defendant's DNA "on the smaller stains." He noted that these particular stains were "more diffused and possibly a little smeared." Profiles from blood on both knives belonged to the victim. He tested only the items delivered to him that he "thought would be most probative" and noted that he would have performed further testing upon request from either the State or the defendant.

Mr. Ihrie said that although it was theoretically possible that the defendant could have left DNA on the two-by-four when he went to aid the victim, it would not "be very likely" given the amount of blood on the weapon and the mixture of DNA he found. He explained that "if you have a lot of DNA from one person and a very small amount of DNA from a second person," the small amount doesn't show up in testing. The majority of the victim's blood on the defendant's pants was "near the waistband and the pocket" on the right side, but there were "other smaller stains" on the left pant leg.

At the conclusion of this testimony, the State rested, and the defendant offered the testimony of Brett Randall, the defendant's best friend. Mr. Randall said that when he was interviewed by the police, they "indicated to [him] that they were looking for the why, not the who." He recalled that he saw the defendant the day before the murder and that the defendant seemed normal. Mr. Randall testified that since the murder, the defendant had asked Mr. Randall to provide him with information on how to file for bankruptcy.

During cross-examination, Mr. Randall conceded that the defendant had never told him that two Middle-Eastern men had killed the victim in an attempt to extort money from the victim's father.

Based upon this evidence, the jury convicted the defendant as charged of first degree premeditated murder. The trial court imposed a sentence of life with the possibility of parole.

## I. Expert Testimony

The defendant contends that the trial court erred by declaring Officer Johnny Lawrence an expert in blood stain analysis and by permitting the detective to offer an expert opinion in this area. He claims that the State failed to establish that Officer Lawrence was qualified to render such an opinion. He also claims that the detective's testimony amounted to "nothing more than . . . speculation" and, as such, was not of substantial assistance to the jury. The State asserts that the trial court did not abuse its discretion by admitting the testimony.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

During a hearing outside the presence of the jury, Officer Lawrence testified that he had served as a police officer since 1981, first as a patrol officer from 1981 to 1989, then as a homicide detective from 1989 to 1998, then as a crime scene specialist since 1998. He said that his training consisted of "basic in-service classes," "Williams Homicide Seminar" in 1990, a 40-hour "basic blood stain pattern class from Jerry Finley with the TBI" in 2002, and an "IAI" class on blood stain patterns in 2005. In 2003, Officer Lawrence was certified as a member of the "International Association of Blood Stain Pattern." Officer Lawrence said that he had also taught in-service classes on basic crime scene analysis as well as "blood stain pattern interpretation." He said that he had been previously certified as an expert in blood stain analysis in Davidson County Criminal Court.

The trial court permitted Officer Lawrence to testify as an expert, concluding:

> Well, it seems to the [c]ourt that, in fact, Officer Lawrence has had substantial training in the specific area of blood stain patterns; again, . . . there's certainly no question about his qualifications as a crime scene specialist generally. The more specific question is, and how he's being tendered here today, is for purposes of blood stain - - testifying as an expert on blood stain patterns. He has had the basic classes, he has been certified as a member of a recognized national organization, he's also taught classes along those lines, his testimony also indicates that while he may not have taken additional formal education, he has continued to educate himself through textbooks and through recognized leaders in this specific area.

> And, as such, when the [c]ourt considers the appropriate factors for admissibility of expert testimony, the [c]ourt finds that the issues regarding Officer Lawrence go more to the weight of his testimony, as opposed to whether he actually is qualified to testify as an expert.

> So based upon the [c]ourt's consideration of the evidence before it, the [c]ourt will recognize Mr. Lawrence as an expert . . . in the area of blood stain patterns, and allow him to testify as to such, but certainly the defense is entitled to question the weight of that testimony, given the issues that remain."

In our view, the trial court did not abuse its discretion by certifying Officer Lawrence as an expert in the field of blood pattern analysis. Officer Lawrence's testimony

established that he had both training and experience in the field and had been previously declared an expert in this area. Moreover, the State established that his testimony would help the jury understand the various blood stains depicted in the photographs. Finally, even had the trial court erred by admitting this evidence, we do not find it nearly so crucial as the defendant has deemed it. In consequence, any error was harmless.

## II. Jury Instruction

The defendant next contends that the trial court erred by denying his request for a curative instruction regarding testimony about his invoking his right to remain silent. He claims that repeated references to his invoking his right to remain silent violated his constitutional rights and that the failure to issue a curative instruction entitles him to a new trial. The State argues that the defendant cannot complain of error because he elicited the offending references during cross-examination. The State also points out that no witness ever specifically stated that the defendant had invoked his constitutional rights to remain silent and have the assistance of counsel and that counsel failed to contemporaneously request an instruction.

We need not tarry long over the defendant's claim because the only testimony that could arguably be seen as a comment on the defendant's failure to answer police questions was directly solicited by the defense during cross-examination and because the defendant failed to make a contemporaneous objection to the testimony. *See* Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection). Moreover, the record establishes that the challenged testimony, which came from Lieutenant Whitwell, was not actually an improper comment on the defendant's constitutional rights. When pressed by defense counsel as to why he did not do more to investigate the defendant's claim regarding the two alleged perpetrators, Lieutenant Whitwell responded, "[W]hen we asked to speak with [the defendant] in regards to this situation and everything, he said he was not going to speak with us, he was going – he wanted his attorney there, so we were unable to get any further information to investigate this crime scene." This testimony was a reasonable and responsive answer to defense counsel's question.

## III. Sufficiency

The defendant challenges the sufficiency of the convicting evidence, claiming that the State failed to exclude every reasonable hypothesis other than the defendant's having

murdered the victim. In addition, he claims that even if the State established that he killed the victim, it failed to prove premeditation. The State contends that the evidence was sufficient to support the defendant's conviction.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As is applicable in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim.

-11-

App. 2007)*; see also State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* § 7.7 (2d ed. 1986)). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

The evidence adduced at trial sufficiently established the defendant's guilt of the charged offense. Proof showed that the defendant telephoned the non-emergency line of the SHPD to report that his wife had been murdered. Upon officers' arrival at the couple's residence, the defendant did not answer the door or respond to their commands. Indeed, when they announced their presence, the defendant ran up the stairs. After he finally surrendered to police, the defendant offered no information regarding the circumstances of the victim's death. Police found the victim face down on the bed with a knife in her back, a ligature around her neck, and earplugs in her ears. A bloody two-by-four nearby had a mixture of the defendant's and the victim's DNA on the "handle" end. The medical examiner testified that the victim suffered blunt force trauma to her head sufficient to cause her death, stab wounds to her back sufficient to cause her death, and ligature strangulation sufficient to cause her death. All of the victim's injuries were inflicted from behind. Although the defendant's theory was that two unknown, Middle-Eastern men had murdered the victim to extort money from her father, no evidence supports his theory. That the defendant was alone at the scene, had blood on his clothing, and that his DNA was found on one of the murder weapons supports the conclusion that he murdered the victim. The infliction of multiple, "multimodality" blows on the unarmed victim, the particular cruelty of the killing, and the defendant's calmness after the killing support a finding that he did so intentionally and premeditatedly.

*IV. Cumulative Error*

Finally, the defendant complains that the cumulative effect of the errors at trial deprived him of the right to a fair trial. Because we discern no error in the rulings of the trial court, no errors accumulate to yield a constitutionally defective trial.

*V. Conclusion*

The trial court did not err by permitting Officer Lawrence to provide expert opinion testimony on the issue of blood stain interpretation or by denying the defendant's

request for a curative instruction.  The evidence is sufficient to support the defendant's conviction, and no error exists to contribute to cumulative error.  Accordingly, the judgment of the trial court is affirmed.


_____

JAMES CURWOOD WITT, JR., JUDGE